## In re DUGGAN.

### COHEN v. CHAMBERS.

(Circuit Court of Appeals, Fifth Circuit. November 29, 1910.)

### No. 2,122.

CHATTEL MORTGAGES (§ 194*)—WITHHOLDING CHATTEL MORTGAGE FROM RECORD.

A chattel mortgage given by a bankrupt on his stock of merchandise and withheld from record for several months by the mortgagee under a tacit agreement to do so because of the effect which the record would have on the mortgagor's credit is fraudulent and void both as to prior and subsequent creditors.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 426, 427; Dec. Dig. § 194.*]

Appeal from the District Court of the United States for the Southern District of Georgia.

In the matter of Mrs. S. L. Duggan, bankrupt. Appeal by Louis Cohen from an order of the District Court. Affirmed.

Thomas S. Felder, for appellant.

Jno. R. L. Smith, for appellee.

Before PARDEE and SHELBY, Circuit Judges, and TOULMIN, District Judge.

SHELBY, Circuit Judge. Mrs. S. L. Duggan having been adjudicated a bankrupt, Louis Cohen presented his petition to the referee, claiming that she was justly indebted to him in the sum of $494, with interest, and that the same was secured by a mortgage dated May 17, 1909. The bankrupt at the date of the mortgage was engaged in the mercantile business, and the mortgage was on her stock of goods and store fixtures. The trustee filed objections to the claim, alleging that the mortgage was not a valid and subsisting lien upon the property described; that the same was in violation of the bankruptcy law, in that it was given by the bankrupt and accepted by the mortgagee in fraud of the other creditors; and that, while it purports to have been executed on May 17, 1909, it was given for a past-due indebtedness and withheld from the records till July, 1910, and that the withholding of it from the records was for the purpose of giving the bankrupt credit and commercial standing, and was a fraud upon the other creditors of the bankrupt. The claimant, Louis Cohen, was examined as a witness in his own behalf, and J. W. Duggan, the husband of the bankrupt and her business manager, was also examined. The following excerpts show the substance of the material part of their testimony:

"Louis Cohen: The second time they (the bankrupt and her husband) came to me was for the borrow of $600 for the purpose of helping them in their store, and they voluntarily offered me a security on their stock of goods, and they also stated to me that they were perfectly solvent, and it was for the purpose of using it to pay off some indebtedness that was pressing them at the time. I gave them the $600. I sent the paper promptly to Eastman, to the clerk of the superior court there, for record. They lived at Eastman,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Dodge county, and I at Sandersville, Washington county, and I won't be positive how many days it was on record when I received a telephone message from them both, and it was so indistinct that I could just catch enough from the telephone to tell that they were very much agitated and worried over the mortgage having been recorded. So I told them that the best thing they had better do was to come to Sandersville and let me find out what they wanted. It was very indistinct, so they came. They told me that publicity of the mortgage when it was put on the record, that the wholesalers they had been buying of told them that they would not sell them any more as long as this mortgage was on record, and they 'begged me to take it off. In the meantime they brought me $150 cash to reduce that mortgage. I knowing the parties for a number of years, knowing them to be honest and straight, I took this mortgage then with the interest, and they asked me not to put this on record. I did not promise them anything, and they also promised to pay me in monthly payments until this paper was liquidated. Before maturity, I think it was when the first payment as per promise came due. I wrote them, and they answered me back that they would make a remittance soon. That passed on, and in the course of my being busy I overlooked this until one day Mr. Duggan came down to see me and asked me for advice, and in that conversation he then told me his condition. I says, 'Well, Mr. Duggan' I says, 'from your statement you are broke.' He says, 'Oh, no, sir; I have got plenty of assets.' I says, 'Yes, sir; you are broke, and I am going to put my mortgage on record right to-day.' I sent it that very same evening over to the record. That was the 4th day of January, 1910. He went into his condition with me at that time, and was advising with me as to what he should do. I told him he was then broke. He told me that I was mistaken; that he had plenty of assets and he was not; that he was perfectly solvent. He was honest in his statement. He showed feeling about it. When I told him and showed him he was broke, he cried. I took this mortgage which I am now setting up in bankruptcy, due October 15th, the 17th day of May, 1909. Mr. Duggan paid me that time $150, and then I extended—I took a new mortgage for the balance. This is the balance, the amount of this note and mortgage here claimed. He stated to me he was then perfectly solvent. I asked him. I believed what he said. I had every reason to believe everything that both of them said. I made no definite promise as to keeping it off record. I made him no promise. I had loaned him $600 a short time previous to that, and he came in and paid part of it. And then I extended the indebtedness and took this new mortgage. And this new mortgage I did not put on record until I found out his condition. But I did not have any agreement with him not to put it on record.

"Q. Why was it you took this $600 mortgage off record, canceled the record of this mortgage? A. They told me that the mortgage I first put on was hurting their credit the minute it was put on—that is the one they telephoned me about.

"Q. Why did you comply with their request about that? A. From their first statement, and then having confidence in their standing and in their solvency, knowing them, I kept it then off record. I thought they would comply with their promise to give me partial payments until when it was due, the second one I had written. It would be liquidated before it was due, while I made the second one the 15th of October, but before they executed it, before it was ever drawn up, they had made me a promise to pay me so much every month that before the 15th the balance of it would have been paid up.

"Q. Your object, then, in canceling the first mortgage and taking a new one, was to extend their credit, give them a better credit than they would have had if it had remained on record? A. From their statement I did, to accommodate them.

"Q. That was your object in doing that? A. Yes, sir.

"Q. You knew, if you didn't do it, their credit would be ruined? A. From their statement and to accommodate them and by their statement is the reason I accommodated them, took it off and took a new one.

"Q. They told you that putting that first mortgage on record was ruining their credit? A. Yes, sir.

"Q. And that no wholesaler would sell them as long as it was on record? A. Yes, sir."

"J. W. Duggan: I managed the business of my wife. The occasion of that mortgage being canceled from the record, that was given first, the $600 mortgage was. We needed $600, and my wife wrote and asked him for $600. We told him that we would give a mortgage on the stock of goods if he wanted it. The money came right along. We gave him a mortgage on the stock of goods, and in a few days we saw where it was hurting us. I mean we could not buy goods with that mortgage on record; that is, people would know it was on there. We could not buy goods. Of course, pretty nearly everybody knew it. We phoned him, and he could not understand us, so he told us we had better come over there. We went over there and paid him $150. He took it off, canceled the mortgage. He did that because we asked him to. We asked him to for the simple fact it was hurting our business. I guess we told him that fact. I am not certain. I reckon we told him it was hurting our business. That is what we meant.

"Q. State whether or not there was any request made of Mr. Cohen to keep this second mortgage off the record? A. He didn't make any promise at all there, just to get that mortgage off. To tell you the truth, I don't know positively whether we asked him not to record it or not, but he didn't do it. I know one thing—it didn't make any difference whether we asked him or not. It was not done. Possibly we did ask him not to do it. I think we asked Mr. Cohen not to put it on as long as he could help it; that is the best of my recollection. I think I did do that. I can't tell you what he said. He said he would take this one off. If we paid him $150, he would take this one off."

The referee decided that the mortgage was valid and entitled to priority of payment in full out of the funds arising from the sale of the stock of goods covered by the mortgage, and directed the trustee to pay it. The trustee thereupon filed a petition to review the decision of the referee, and the question of the validity of the mortgage was certified to the District Court. The District Court reversed the ruling of the referee, and held that the mortgage was fraudulent and void. The first order entered in the District Court was to the effect that the mortgage was void as to all creditors, antecedent and subsequent. After this order was entered, the attorney for the claimant called the attention of the judge to the fact that the order did not follow the ruling of the court, and that the order should have been that the mortgage was void only as to subsequent creditors. Thereupon an order was entered modifying and changing the order complained of, and directing that the intervention of Cohen be again referred to the referee to take an accounting of the creditors who contracted debts subsequent to the making of the mortgage, and that as to the subsequent creditors the mortgage should be void, but, as to all other creditors, it should be valid. The fund arising from the sale of the mortgaged property was sufficient to pay off and discharge all of the subsequent creditors and to leave a balance sufficient to pay the mortgage. The trustee applied to the District Court for a rehearing, which was granted. On rehearing, after argument by counsel on both sides, it was finally held by the District Court that the mortgage was void as to all the creditors of the bankrupt, those who contracted their debts prior to the making of the mortgage as well as those who contracted their debts subsequent to the making of the mortgage, and the petition of the claimant to have his mortgage declared a prior claim was dismissed and refused. Cohen, the claimant, seeking to establish the priority of his mortgage, appealed from this order.

In Clayton v. Exchange Bank, 121 Fed. 630, 57 C. C. A. 656, we held, on the facts of that case, that certain mortgages were fraudulent and void. It was so held on the objection of subsequent creditors, chiefly on the ground that the mortgage had been withheld from record upon a tacit understanding between the mortgagor and the mortgagee for the purpose of bolstering the credit of the former. There was no reference in the case to creditors whose claims accrued prior to the mortgage. In the statement of the case it was said:

"These objections (to the mortgages) were made in behalf of the unsecured creditors, who became creditors, it is admitted here, after the execution of the mortgages, and while they were unrecorded."

And in the opinion it was said:

"The creditors who seek to avoid the priority of the mortgages are those who sold goods to the mortgagor after the execution of the mortgages, and while they were withheld from record."

The court clearly had in view an attack for fraud on mortgages by subsequent creditors only. No prior creditor appeared in that case, certainly none to claim that, although the mortgages might be void as to subsequent creditors, they should be treated as valid as to prior creditors.

The evidence in the instant case fully sustains the conclusion of the trial judge that the mortgage was withheld from the record for the purpose of giving the mortgagor a fictitious credit. This fact, with the other circumstances disclosed by the record, is quite sufficient to bring the case within the authority of the Clayton Case as to subsequent creditors.

But it is assigned that the court erred in holding that the mortgage was made "invalid as to all creditors of whatever class." It is contended that the withholding of the mortgage from the record, although it bolstered the credit of the mortgagor and enabled him to contract other debts, did not affect the prior debts of the mortgagor, and that, if held invalid as to the subsequent debts, the mortgage should remain a superior claim to the prior debts.

Usually the prior or existing creditor is in a better position than the subsequent creditor from which to attack a conveyance for fraud. For example, a voluntary conveyance may be successfully attacked by an existing creditor by merely proving the existence of the debt at the date of the conveyance, that the conveyance was without consideration, and that the debtor has no other property than that conveyed sufficient to satisfy complainant's claim. A subsequent creditor would have to allege and prove additional facts to show that he was injured by the fraudulent conveyance although his debt did not exist when it was made. The difference, therefore, between existing and subsequent debts in reference to voluntary conveyances is this: As to the former, fraud is an inference of law, and, as to the latter, there must be fraud in fact. The rights of the two classes of creditors to relief, and the proof required to obtain a decree annulling the conveyance attacked, are necessarily different; the differences depending on the facts of each particular case. But this is not relevant here except to show that it is the subsequent, and not the existing, creditor, who

has usually the greater burden to establish his right to relief. In this case we are concerned only with the kind of decree for distribution that should be entered when the attack made by a trustee representing both classes of creditors has been successful.

In the first place, it should be noted that the Georgia statute condemning conveyances and contracts "made with intention to delay or defraud creditors" makes no distinction between prior and subsequent creditors. The act of making such deed or contract is made void against "creditors and others." Civ. Code Ga. 1895, § 2695.

The letter of the statute indicates that when a successful attack is made, and the contract is annulled and declared void, it is void as to all "creditors and others." Commenting on a similar statute, the Supreme Court said:

"If the facts and circumstances show clearly a fraudulent intent, the conveyance is void against all creditors, past or future." Parish v. Murphree, 13 How. 92, 98, 14 L. Ed. 65.

In Kehr v. Smith, 20 Wall. 31, 36, 22 L. Ed. 313, the court said:

"It is well settled, where a deed is set aside as void as to existing creditors, that all the creditors, prior and subsequent, share in the fund pro rata."

This principle was applied in a case like the one at bar. A trustee in bankruptcy attacked a mortgage as fraudulent. The master to whom the case was referred reported the names of the creditors whose claims accrued while the mortgage was fraudulently withheld from record, and recommended that the mortgage be held invalid for the benefit of those creditors; but the court held that it was void as to all creditors, antecedent and subsequent. Mitchell v. Mitchell (D. C.) 147 Fed. 280, 286.

It is suggested that only the subsequent creditors—those who gave credit while the mortgage was withheld from record—were injured by the fraud, and that, therefore, the prior creditors—those who extended credit before the mortgage was executed—should not share in the distribution. But this contention is not well founded. The existing creditors were probably lulled into inaction by the withholding of the mortgage from the record. If it had been promptly recorded, they might have proceeded at once to enforce their claims. In that way they may have been hindered or "delayed."

The general rule is that the proceeds of the property adjudged to be fraudulently conveyed should be distributed ratably among all the creditors, preserving, however, the rights of those, if any, who have liens on the property. Day et al. v. Washburn et al., 24 How. 352, 356, 16 L. Ed. 712.

There is nothing in the bankruptcy law to require a departure from this general rule. On the contrary, it provides that dividends of an equal per centum shall be declared and paid on all allowed claims, except such as have priority or are secured. Bankr. Act July 1, 1898, c. 541, § 65a, 30 Stat. 563 (U. S. Comp. St. 1901, p. 3448). If the mortgage were declared void as to one set of unsecured creditors and valid as to another set of unsecured creditors, it would result in an unequal distribution among creditors of the same class.

The trustee was vested by operation of law with all property trans-

ferred by the bankrupt in fraud of his creditors. Id., § 70a. When the mortgage is declared void, the trustee holds the mortgaged property unincumbered by the mortgage, and it is subject to pro rata distribution just as any other property of the bankrupt.

The learned judge of the District Court, in the decree appealed from, decided correctly, and the decree is affirmed.